UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANTOINETTE W. RICHARDSON          CIVIL ACTION

VERSUS          NUMBER: 08-4124

MICHAEL J. ASTRUE,          SECTION: "S"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' briefs following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 12, 13).

On July 17, 2006, Antoinette W. Richardson, plaintiff herein, filed the subject applications for DIB and for SSI benefits, respectively alleging disability as of June 1, 2006 and January 1, 2005. (Tr. pp. 58-62, 272-274). In an undated Disability Report that appears in the record, the conditions resulting in plaintiff's

inability to work were identified as lupus, blindness in one eye, fibromyalgia, and Hashimoto's thyroiditis. (Tr. pp. 83-92). Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on August 28, 2006. (Tr. pp. 43-46). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on February 25, 2008 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 40-42, 282-298). On March 10, 2008, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 11-21). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her supporting brief, plaintiff frames the issues for judicial review as follows:

I.   The ALJ erred in failing to give controlling weight to plaintiff's treating physician.

II.  The ALJ erred in failing to evaluate plaintiff's credibility properly.

(Rec. doc. 12-3, pp. 8-9).

Relevant to the issues to be decided to the Court are the following findings made by the ALJ.

1. [a]dministration records indicate that Claimant met the insured status requirements of the Act on the date she allegedly became unable to work, June 1, 2006, and that she will continue to meet them through December 31, 2010.

2. [t]here is no evidence of substantial gainful activity since the alleged onset date.

3. [c]laimant has the following "severe" impairments: fibromyalgia and rheumatoid arthritis with a prior or alternative diagnostic impression of systemic lupus erythematous, and obesity.

4. [t]he evidence does not show that any impairment or combination of impairments meets or equals the criteria of any impairment set forth in the Listing of Impairments at Appendix 1, Subpart P, Regulations Part 404.

5. [c]laimant's allegations concerning her symptoms and limitations are partially credible.

6. [c]laimant has the residual functional capacity to perform a limited range of light work with no climbing of ladders, ropes, or scaffolds, frequent balancing, occasional stooping, kneeling, crouching, and crawling, and only limited reaching in all directions including overhead reaching.

7. [c]laimant is able to perform her past relevant work as a pharmacy tech, at least as such work is generally performed in the national economy.

8. [a]dditionally and in the alternative, Claimant is able to perform other work existing in significant numbers in the national economy within the framework of Medical-Vocational rule 202.21. Examples of jobs she can perform include cashier, general office clerk, and receptionist/information clerk.

(Tr. p. 20).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1983). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1985).

A claimant seeking DIB or SSI benefits bears the burden of

4

proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2. an individual who does not have a "severe impairment" will not be found to be disabled.

> 3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

> 5. if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work

can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of the claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

At the time of the administrative hearing that was held on February 25, 2008, plaintiff was thirty-seven years of age, had completed twelve grades of formal education in addition to obtaining special training as a certified nursing assistant ("CNA")

and a pharmacy technician, and had past relevant work experience as a pharmacy technician and a CNA. At the start of the hearing, plaintiff's attorney opened by arguing that plaintiff's condition satisfied the criteria of Section 14.02 of the Listing of Impairments based on a 2006 diagnosis of lupus and Dr. Spady's findings of joint inflammation; pain in the knees, elbows, and joints in general; breathing problems with chest pain and dyspnea; blindness in the left eye; a constant low-grade fever; and, weight loss. Counsel also pointed to the information contained within a Physical Capacity Evaluation ("PCE") form that had been completed by Dr. Spady on December 29, 2006 and the fact that plaintiff had already been issued a handicap parking permit. (Tr. pp. 284-285).

Plaintiff then took the stand and testified that she had stopped working in June of 2006 due to increased physical problems such as chest pain and swelling in the legs after working twelve-hour shifts. These problems resulted in increased absences from work, plaintiff's subsequent placement on medical leave, and her ultimate termination. Lupus-related symptoms included fatigue, joint swelling, chest pain, hair loss, and problems with manipulation such that she would drop things. Plaintiff's memory had also begun to falter and as a pharmacy tech who was responsible for preparing IV's for other patients, she spent an increasing amount of time going back to verify that the correct

drugs in the proper doses had been administered.  Plaintiff lived at home with her four children, ages seventeen, sixteen, nine and eight, the two oldest of whom helped plaintiff with the younger two.  Child support in the amount of $600 per month had been awarded to plaintiff but it was paid only sporadically. (Tr. pp. 285-290).

Upon further questioning by her attorney, plaintiff testified that she suffered from pain in all of her joints but that her legs were most problematic.  She experienced difficulty with standing more than five minutes, could walk for less than one block, and could sit for only five minutes before becoming dizzy and lightheaded.  Daily activities included driving her children to school and then returning home to take her prescribed medication which left her sleepy and in need of a nap. After several hours plaintiff would awaken, take more medication, and then return to sleep until it was time to pick her children up from school if her son was unable to do so.  Household chores were performed by plaintiff's seventeen-year old daughter but occasionally plaintiff assisted if she was taking Prednisone and had an injection of Humira.  Other medications included Avapro, Zaroxolyn, and Lexapro for depression which had been prescribed by Dr. Spady. (Tr. pp. 290-293).

Thomas Meunier, a VE, was next to take the stand.  He first

classified the exertional and skill demands of plaintiff's prior work as a pharmacy tech as light, semi-skilled and those of her prior work as a CNA as medium, semi-skilled. The ALJ then posed a hypothetical question to Meunier which assumed an individual who could lift twenty pounds occasionally , ten pounds frequently; who could stand, walk, and/or sit for six hours per eight-hour workday; who could never climb ladders, ropes, or scaffolds; who could occasionally stoop, kneel, crouch, and crawl; and, who was unable to do any overhead lifting or reaching. With those limitations in mind Meunier testified that the individual described in the hypothetical question could perform plaintiff's past work as a pharmacy technician. In addition, the individual could function as a cashier, general office clerk, receptionist, and information clerk with significant numbers of such jobs existing in the national and local economies. However, if the individual was absent from her job for two days per month there would be no work that the person could perform. (Tr. pp. 294-296).

Prior to questioning the VE, plaintiff's counsel pointed out that the residual functional capacity assessments that had been rendered by the Office of Disability Determination Services earlier in the case were done without the benefit of Dr. Spady's treatment records. Counsel then directed Meunier's attention to the limitations set forth in the PCE form that had been completed by

Dr. Spady on December 29, 2006 and asked whether such an individual could perform any work. Meunier answered that question in the negative. Counsel then stressed that the PCE form was the only functional assessment that had been rendered since plaintiff had been diagnosed with lupus. (Tr. pp. 296-298).

The documentary evidence generated during the relevant time period[1]/ begins with the concluding portion of a note authored by Dr. Pervez Mussarat dated November 2, 2005 which appears to indicate that nerve conduction studies and EMG results were within normal limits. (Tr. p. 120). Plaintiff was next seen by Dr. Mussarat for follow-up care on December 1, 2005 but the doctor's note from that date, like many of his others, is far from being a model of legibility. As best can be determined, it appears that plaintiff may have been involved in some type of vehicular accident but with no loss of consciousness. Provigil was apparently dispensed but on December 6, 2005, plaintiff reported that it was ineffective so plaintiff was given Adderall samples. (Tr. pp. 120, 119). Dr. Mussarat's subsequent treatment note from December 12,

---

[1]/ As a general rule, an ALJ is required to develop the medical history of a DIB claimant for the twelve months preceding the alleged onset date and the medical history of a SSI claimant for the twelve months prior to the date that the application for benefits was filed. Parker v. Astrue, 2008 WL 544386 at *2 (D. Kan. 2008); Winters v. Barnhart, 2002 WL 1286134 at *10 (D. Kan. 2002).

2005 is largely unreadable. (Tr. p. 119).

On January 9, 2006, plaintiff presented herself to Dr. Harold Raphael for completion of medical leave paperwork, having missed work in September and October of 2005. The doctor's note indicates that plaintiff had been diagnosed with narcolepsy by an unidentified neurologist but she was otherwise doing okay on the date of the office visit. Medications at the time included Glucophage, Adderall, Ambien, and Levoxyl. The diagnosis was narcolepsy, hypothyroidism, and weight gain but with recent weight loss. Plaintiff was given a refill of her medications and was to return to the clinic as needed. (Tr. p. 112). She reported that Adderall was helpful when she was next seen by Dr. Mussarat on January 18, 2006 and the impression was narcolepsy. (Tr. p. 118). Plaintiff returned to Dr. Raphael on March 30, 2006 to have her thyroid checked and for complaints of abdominal bloating. A history of thyroid trouble, possibly Hashimoto's thyroiditis, was noted. Despite her complaints at the time, plaintiff had been losing weight and her energy had improved. The assessment was a possible side-effect to Metformin, hypothyroidism, and narcolepsy. Bloodwork was done and plaintiff's medications were to be adjusted. (Tr. pp. 111, 114, 132).

Plaintiff was next seen by Dr. Mussarat on April 4, 2006 but the note from that date is difficult to decipher. (Tr. p. 118).

She telephoned the doctor's office the following day to inquire as to whether dizziness and/or blood pressure changes were a side-effect of Clonidine. (Tr. p. 117). Plaintiff voiced the same concerns to Dr. Raphael on April 7, 2006 but was otherwise feeling okay. The assessment was high blood pressure and medication side-effects for which plaintiff was prescribed Catapres-TTS. (Tr. p. 110). On April 27, 2006, plaintiff was seen by Dr. Marya Porter for her annual gynecological evaluation. A history of Hashimoto's thyroiditis was noted as was plaintiff's non-compliance with medication. The results of the examination were normal. (Tr. pp. 174-175, 190). Bloodwork was performed the following day. (Tr. pp. 192-194). Plaintiff indicated that Adderall was helpful when she was next seen by Dr. Mussarat on May 1, 2006 but the rest of the note is difficult to read. (Tr. p. 117).

Plaintiff was subsequently seen by Dr. Edmund Spiller, an associate of Dr. Raphael's, on May 16, 2006 for complaints of sinus symptoms, left ear soreness, and mild vertigo. Medical history was said to include hypertension, diabetes, and questionable ADD. The assessment was an upper respiratory infection, suspected sinusitis, and a description of vertigo. The plan included the use of Antivert for symptomatic relief and Erythromycin. (Tr. p. 109). Complaints voiced to Dr. Spiller on May 24, 2006 were diffuse myalgia, fatigue, generalized weakness, and poor sleep. Based on

a review of the doctor's treatment note, it appears that plaintiff had been followed by another practitioner for work-up of fibromyalgia and connective tissue disorder. Plaintiff presented as mildly fatigued but not chronically ill. The assessment was a history of fibromyalgia and/or other connective tissue disorder, possible sinusitis, hypothyroidism, questionable continued steroid use, hypertension, and reported diabetes. A CAT scan of plaintiff's paranasal sinuses was to be obtained if antibiotics did not resolve her condition. (Tr. p. 108). The latter test was performed on May 26, 2006 and it produced otherwise negative results except for some trace mucosal thickening about the superior aspect of the maxillary antrum. (Tr. pp. 113, 130).

On June 2, 2006, plaintiff was evaluated by Dr. Malik Spady of Northlake Rheumatology. Presenting problems included leg and shoulder pain and leg swelling. Dr. Spady observed that plaintiff suffered from arthritis which had been diagnosed three years earlier with progressively worsening joint symptoms and moderately severe discomfort. Primary joints affected included the elbows and knees, with swelling of the left leg below the shin and joint stiffness for less than one hour after rising in the morning; "gelling" of the joints after periods of inactivity; swelling of the left leg; fever; and, myalgia. In the "review of systems" section of his report, Dr. Spady noted positive findings for

blurred vision and photophobia, ear pain, tinnitus, nasal congestion, hoarseness, chest pain, orthopnea, palpitations, paroxysmal nocturnal dyspnea, pedal edema, and tachycardia. Positive gastrointestinal signs were abdominal pain, acid reflux symptoms, anorexia, abdominal bloating, dysphagia, constipation, diarrhea, heartburn, hemorrhoids, nausea, and vomiting. Those related to the musculoskeletal system were positive for athralgias, back pain, joint stiffness, and limb pain. Memory loss was also noted.

At the time of this evaluation by Dr. Spady, plaintiff's occupation was identified as a pharmacy technician. Plaintiff did not exercise regularly but she could bathe and dress herself, clean the house, cook meals, drive a car, and generally live independently. Medications included Prednisone, Pamelor, Adderall, Glucophage, Ambien, Levoxyl, Lasix, Clonidine, and Pepcid. Despite what was recorded earlier in the report, upon physical examination plaintiff had a normal heart rate at a regular rhythm with normal heart sounds and no bruits or edema. There were no Heberden's nodes, Bouchard's nodes, or synovitis of the various joints of the fingers. Gait was normal, muscle strength and tone were grossly normal, and there was a full, painless range of motion of all major muscle groups and joints with no laxity or subluxation. On mental status examination, plaintiff was alert and oriented times three

14

with appropriate effect and demeanor, intact recent and remote memory, and good insight and judgment. The assessment was joint pain at multiple sites, leg pain, shoulder pain, and leg swelling. Plaintiff was prescribed Cymbalta and Darvocet-N and was to undergo further testing. (Tr. pp. 267-270).

On June 6, 2006, plaintiff returned to Dr. Raphael for complaints of a sinus headache with congestion, drainage, and pressure to the front of the face. Plaintiff also admitted to some photophobia, phonophobia, nausea, and blurred vision. She was observed to be in minimal discomfort with mild sinus tenderness about the face. The assessment was a migraine headache and sinus allergies. Plaintiff was administered some Imitrex and her symptoms quickly improved within thirty minutes. Additional Imitrex was prescribed as was Nasacort. (Tr. p. 107). Lupus-related bloodwork was performed on June 8, 2006. (Tr. pp. 128-129). An eye examination was done on June 20, 2006 at the Eye Care & Surgery Center. Plaintiff's vision was 20/20 on the right and 20/400 on the left and her medical history was said to be positive for hypertension, arthritis, thyroid problems, lupus, and migraine headaches. (Tr. p. 147).

Plaintiff returned to Dr. Mussarat for follow-up evaluation on June 29, 2006 and complained of confusion, decreased memory, and crying spells. Possible narcolepsy was diagnosed. (Tr. p. 116).

Pursuant to a referral from Dr. Mussarat, on July 10, 2006, plaintiff underwent an MRI of the brain with and without contrast. The results of the study were limited based on significant artifact from plaintiff's motion but otherwise no acute intracranial process was identified. (Tr. pp. 121-122). Plaintiff complained of confusion when she was next seen by Dr. Mussarat on July 13, 2006. The assessment was migraines, possible narcolepsy, and depression. Zoloft was prescribed. (Tr. p. 115). She was also evaluated by Dr. Spady on that date for leg and shoulder pain, leg swelling, and increased confusion. Physical examination findings were the same as those that were recorded on June 2, 2006. The assessment was joint pain at multiple sites, leg pain, shoulder pain, leg swelling, fibromyalgia, and an elevated sedimentation rate. Plaintiff was prescribed Plaquenil and was to receive cortisone injections and other testing. (Tr. pp. 263-266). An EEG also performed on that date was normal. (Tr. p. 123). Labwork which had been ordered by Dr. Spady was performed on July 17, 2006. (Tr. pp. 127, 260-262). An MRA of the brain without contrast that was done on July 19, 2006 revealed no evidence of any significant stenosis and no abnormalities in the major cerebral vessels. (Tr. pp. 125-126).

On July 30, 2006, plaintiff completed the Administration's standardized form denominated "Function Report-Adult". Despite the

activities of daily living that had been reported by Dr. Spady just two weeks earlier, plaintiff indicated that she spent 95% of her time in bed and that she prepared no meals and performed no house or yardwork. (Tr. pp. 67-74). Additional bloodwork was done on August 8, 2006. (Tr. p. 259). Plaintiff returned to Dr. Spady on August 17, 2006 and the majority of the treatment note from that date was the same as that generated at plaintiff's July 13, 2006 office visit. The assessment remained unchanged and plaintiff was prescribed Imuran and Lortab. (Tr. pp. 255-258).

On August 24, 2006, an Administration physician, Dr. Charles Lee, reviewed plaintiff's file and set forth his findings on the Administration's "Physical Residual Functional Capacity Assessment" form. There, the physician indicated that plaintiff could lift twenty pounds occasionally, ten pounds frequently; could stand, walk, and/or sit for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb ladders/rope/scaffolds; could occasionally stoop, kneel, crouch, and crawl but could frequently climb stairs and balance; was limited in the ability to reach but otherwise had no manipulative limitations; and, had no visual, communicative, or environmental limitations. (Tr. pp. 135-142). Essentially, the doctor concluded that plaintiff was capable of light-level work. (Tr. pp. 133-134).

Plaintiff was seen by Dr. Dennis Booth of Northlake

Gastroenterology Associates on September 18, 2006. Dr. Booth recalled having treated plaintiff several years earlier for constipation, rectal bleeding, and internal hemorrhoids revealed through colonoscopy. Plaintiff's constipation had recently worsened and the plan was a thorough administration of GoLytely and a prescription for Zelnorm. (Tr. p. 169). Additional labwork was done on September 25, 2006. (Tr. pp. 166-168, 253-254). Plaintiff returned to Dr. Booth for follow-up care on September 27, 2006 and she was now experiencing severe abdominal pain and continuing constipation. The assessment was suspected constipation-predominant irritable bowel syndrome. Plaintiff was continued on Zelnorm and was placed on Miralax with over-the-counter softeners to be used as needed. (Tr. p. 165). A colonoscopy done on October 5, 2006 could not be completed secondary to inadequate preparation but the rectum appeared normal. (Tr. p. 164).

On October 18, 2006, plaintiff presented to Dr. Spady with complaints of leg pain and swelling. The assessment on this date was lupus, leg pain, leg swelling, and fibromyalgia. Plaintiff was to start on Protonix and additional testing was ordered. (Tr. pp. 251-252). Testing specimens were collected on October 20, 2006. (Tr. pp. 161-162, 247, 248). A fluoroscope gastrographin enema was also performed on that date which revealed a loss of the haustral markings from the splenic flexure to the rectum often seen with

chronic laxative or enema use, ulcerative colitis, or Crohn's disease. (Tr. p. 163). A pregnancy test was reported as negative on October 31, 2006. (Tr. p. 182). Plaintiff returned to Dr. Booth to obtain the recent test results on November 1, 2006. Her constipation had improved by that time but she was now complaining of nausea and a loss of appetite. An upper endoscopy and CAT scan were contemplated. (Tr. p. 160). The scan of the abdomen and pelvis was done on November 7, 2006 which revealed a left simple renal cyst and a mild amount of free fluid in the lower pelvis thought to be bilateral ovarian cysts. (Tr. pp. 158-159).

On November 8, 2006, Dr. Booth performed an esophagogastroduodenoscopy with biopsy upon plaintiff in an attempt to determine the source of her abdominal pain. Biopsies of the antrum were taken and the postoperative diagnosis was antritis and non-erosive grade I esophagitis. (Tr. p. 156). Plaintiff was next seen by Dr. Porter on November 10, 2006 for complaints of abdominal pain and possible pregnancy. The assessment was female genital symptoms. Another pregnancy test was ordered and a pelvic sonogram was contemplated. (Tr. pp. 181-182). A transvaginal ultrasound was performed on November 14, 2006 and it produced normal results. (Tr. pp. 180-181, 188). Plaintiff returned to Dr. Porter to obtain the test results on November 16, 2006 at which time she reported continued intermittent lower abdominal pain but no pelvic pain.

The assessment was a follicular ovarian cyst and plaintiff was to be started on oral contraceptives. Plaintiff's pain was to be monitored in deference to Dr. Raphael's management of her multiple health issues. (Tr. pp. 179-180). She was next seen by Dr. Booth on November 29, 2006 to obtain the results of the tests that were performed earlier in the month. Despite taking Zelnorm, plaintiff continued to have some constipation and Miralax was to be added. Plaintiff was also encouraged to have a follow-up gynecological evaluation for her ovarian cysts. (Tr. p. 155).

The next treatment note generated on December 20, 2006 documents plaintiff's return to Dr. Spady with complaints of leg pain and swelling. The "review of systems" section of the note was the same as previous dates as was the recitation of her activities of daily living and the identification of her occupation as a pharmacy technician. The assessment was lupus, leg pain and swelling, and fibromyalgia. Further testing was ordered. (Tr. p. 241-244).

On December 29, 2006, Dr. Spady completed the PCE form that would later be alluded to during the course of the administrative hearing. There, the doctor checked off the appropriate boxes on the form to indicate that plaintiff could stand and/or walk for less than one hour per eight-hour workday; could sit for less than two hours per eight-hour workday; could lift/carry less than ten

pounds; could not use her hands for repetitive pushing/pulling or fine manipulation and fingering; could not use her feet for repetitive movements such as operating foot controls; could never perform various postural maneuvers or climb stairs or ladders; and, could not reach above shoulder level. Dr. Spady attributed the aforementioned limitations to lupus and fibromyalgia with joint pain and swelling and chronic migraines. The doctor also opined that plaintiff had an extreme limitation in her ability to perform activity within a schedule, to maintain regular attendance, and to be punctual with customary tolerances; in her ability to complete a normal workday and week without interruptions from medically-based symptoms; and, in her ability to perform work at a consistent pace without an unreasonable number and length of rest periods. In answer to the final question on the form which asked if plaintiff was able to tolerate stress, Dr. Spady checked off the box corresponding to "mild". (Tr. pp. 238-240).

When plaintiff was next seen by Dr. Porter on January 4, 2007, she reported improvement with her lower abdominal and back pain through the use of oral contraceptives with no side effects. Plaintiff's prescription medications were refilled and a sonogram was to be scheduled in March to reassess her ovarian cyst. (Tr. p. 179). Routine labwork was also done that day. (Tr. pp. 245-246). Additional testing specimens were collected on February 8, 2007.

(Tr. pp. 236-237). The following day, plaintiff presented to Dr. Porter with an increase in lower pelvic pain which was possibly attributable to a motor vehicle accident she was involved in on January 8, 2007. Plaintiff advised the doctor that she had been diagnosed with irritable bowel syndrome and was on Zelnorm and Protonix but she was unable to say when her last menstrual period was. Abdominal and pelvic examinations were normal. The diagnosis was abdominal pain and constipation. Plaintiff was left on oral contraceptives and was encouraged to use Miralax with a repeat scan to be scheduled in March. (Tr. pp. 178-179).

Plaintiff underwent a second transvaginal ultrasound on March 13, 2007 and was reevaluated by Dr. Porter shortly thereafter. Polyps were possibly present. Bleeding was well-controlled with oral contraceptives but diffuse cramping and abdominal pain were still an issue. The assessment was abdominal pain. The plan was to first attempt to resolve plaintiff' GI problems, including obtaining a second opinion, before follow-up on the possible polyps. (Tr. pp. 177-178, 187). On March 21, 2007, Dr. Porter ordered yet another transvaginal ultrasound after rendering an assessment of a ruptured ovarian cyst. (Tr. p. 177). Despite extensive preparation, the study could not be completed and another imaging modality was to be considered. (Tr. p. 186). Plaintiff returned to Dr. Porter to obtain the results of the testing on

March 22, 2007. Plaintiff's pain had stabilized by this point and she was to pursue the constipation issue with her primary care physician and a specialist. (Tr. p. 176-177).

On April 4, 2007, plaintiff was seen by Dr. Jason Reina, an associate of Dr. Booth's, who noted plaintiff's continuing problems with constipation despite the use of Zelnorm, Miralax, and multiple laxatives and the previously-attempted studies which could not be completed secondary to the GI difficulties. Plaintiff took Lortab to relieve her lupus-induced chest pain. The impression was severe constipation, lupus, hypothyroidism, and the use of pain medications. Zelnorm was to be discontinued but Amitiza was to be added to plaintiff's medication regimen. A further gastrografin enema and colonoscopy were to be scheduled with accompanying preparation protocol. (Tr. p. 154). The former study was performed on April 9, 2007 and it revealed a loss of haustral markings in the distal colon most often seen in individuals with chronic colitis or laxative use. (Tr. p. 153).

Plaintiff was next seen by Dr. Spady on April 10, 2007 whose treatment note is much the same as those generated on previous dates. Conflicting information was present as to the existence of Heberden's nodes or Bouchard's nodes on physical examination. Plaintiff's daily activities had not changed and her occupation continued to be identified as a pharmacy technician. The

assessment was joint pain (multiple sites), leg pain, leg swelling, fibromyalgia, and lupus. No treatment plan was indicated. (Tr. pp. 233-235). Further bloodwork was performed on April 19, 2007. (Tr. pp. 231-232). On April 20, 2007, plaintiff met again with Dr. Porter who ordered a pelvic ultrasound. (Tr. pp. 175-176). That procedure was performed the same day and it revealed a small amount of endometrial fluid but no other focal abnormalities. However, the ovaries could not be identified bilaterally. (Tr. p. 185).

When plaintiff was next seen by Dr. Reina on May 2, 2007, she indicated that Miralax provided only occasional relief and that she had not been taking Amitiza as directed. By this time, Zelnorm had been taken off the market and Lortab had been discontinued by plaintiff secondary to the worsening of her symptoms. The impression was severe constipation with an unremarkable colonoscopy. Dr. Reina recommended continued use of Amitiza, Miralax, and magnesium citrate and follow-up monitoring. (Tr. p. 149). Plaintiff was next seen by Dr. Spady on May 10, 2007. The assessment at the time was joint pain (multiple sites), leg pain, leg swelling, fibromyalgia, and lupus. In addition to her numerous other medications, plaintiff was prescribed Azulfidine, Enteric, Ferrous Sulfate, and Prednisone. Further testing was ordered. (Tr. pp. 227-230).

The next treatment note documents plaintiff's return to Dr.

Spady on July 10, 2007.  Plaintiff had not had the labwork done that was ordered at the previous visit.  The assessment was the same and testing was ordered again with the dosage of Imuran to be increased depending on the outcome of the studies. (Tr. pp. 223-226).  Bloodwork was ultimately done on July 24, 2007. (Tr. pp. 221-222). By August 29, 2007, plaintiff was now complaining of chest pain and shortness of breath in addition to leg pain and swelling.  The assessment on this date was seronegative rheumatoid arthritis, leg pain, leg swelling, fibromyalgia, lupus, precordial chest pain, and shortness of breath. Humira was prescribed. (Tr. pp. 214, 217-219).  Additional labwork was performed on October 3, 2007. (Tr. pp. 215-216).

On October 10, 2007, plaintiff returned to Dr. Spady for follow-up evaluation.  Presenting problems were the same as those voiced by plaintiff on August 29, 2007.  The assessment was rheumatoid arthritis, shortness of breath, leg pain, leg swelling and fibromyalgia.  Strattera was prescribed. (Tr. p. 210-213). Plaintiff was next seen by Dr. Raphael on October 26, 2007 for the purpose of having her medications refilled and for additional bloodwork.  Medications at that time consisted of Lasix, Topamax, Lortab, Synthroid, Avapro, Imuran, Amitza, Azulfidine, Humira, and Abien.  Trace pretibial edema was revealed through a physical examination of plaintiff's extremities.  The assessment was lupus,

rheumatoid arthritis, and hypothyroidism. Plaintiff's medications were refilled. (Tr. p. 171). More bloodwork was performed on November 29, 2007 and January 8, 2008 at the request of Dr. Spady. (Tr. pp. 208-209, 204-205).

By the time that plaintiff was seen again by Dr. Spady on January 14, 2008, she noticed a rash that looked like she had been "scalded" after taking a bath or applying lotion. The rash was attributable to Humira which had been discontinued but plaintiff had restarted on Plaquenil. Plaintiff also complained of a lack of energy, extreme joint pain, shortness of breath, and a low-grade fever. Although plaintiff's occupation was still listed as a pharmacy technician, the recitation of her daily activities was edited to indicate that she could no longer clean the house, cook meals, or drive a car. The portion of the treatment note reflecting the results of the doctor's musculosketal examination was also edited to indicate that there was crepitus, effusion, and tenderness in eighteen tender points. The assessment on this date was rheumatoid arthritis, precordial chest pain, shortness of breath, leg pain, leg swelling, and fibromyalgia. Lexapro was prescribed. Further testing was to be conducted including chest x-rays and an electrocardiogram. (Tr. pp. 199-203). The ordered EKG was performed on January 22, 2008. (Tr. pp. 196-197). Chest x-rays taken on that date revealed no significant abnormalities. (Tr. p.

198).  The administrative hearing would subsequently go forward on February 25, 2008. (Tr. pp. 282-298).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on two grounds.  First, plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of her treating physician, Dr. Spady. Second, plaintiff alleges that the ALJ erred in discrediting her statements as not credible. Those two challenges will be addressed in the order in which they were presented.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion.  <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overrruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)).  A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown.  <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d 492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).  Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when

the evidence supports a different conclusion. <u>Newton</u>, 209 F.3d at 456; <u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians. <u>Newton</u>, 209 F.3d at 453.

Plaintiff argues that the ALJ failed to give controlling weight to the opinion of Dr. Spady. Based upon a review of her brief, it is clear that the opinion to which plaintiff refers is that set forth in the PCE form that the doctor completed on December 29, 2006. (Rec. doc. 12-3, pp. 12-13). Plaintiff argues that the only other assessment of her residual functional capacity ("RFC") was that rendered by Dr. Lee on August 24, 2006 without benefit of Dr. Spady's records or laboratory findings. For the reasons that follow, the Court believes that the ALJ gave Dr. Spady's PCE findings the weight that they deserved.

The Court first notes that the disability onset date identified in plaintiff's application for SSI benefits was January 1, 2005 while the disability onset date in her application for DIB was June 1, 2006, the date she indicated was the last day that she worked. (Tr. p. 84). The earliest medical records document

plaintiff's treatment by Dr. Mussarat in late 2005 in connection with a motor vehicle accident and for nerve conduction and EMG studies which were within normal limits. On January 9, 2006, plaintiff advised Dr. Raphael that she had been diagnosed with narcolepsy but that she was otherwise feeling okay. Plaintiff reported relief with Adderall when she was next seen by Dr. Mussarat on January 18, 2006. On March 30, 2006, plaintiff returned to Dr. Raphael for a check of her thyroid and for complaints of abdominal bloating but her weight was down and her energy level had increased. The diagnosis was a possible side-effect to Metformin, hypothyroidism, and narcolepsy. Plaintiff voiced the same side-effect complaints to Dr. Raphael on April 7, 2006 but was otherwise feeling okay.

Plaintiff had no complaints when she underwent an annual gynecological evaluation by Dr. Porter on April 27, 2006 who noted that plaintiff had been non-compliant with her medications.[2]/ On May 16, 2006, plaintiff was treated by Dr. Spiller for symptoms of an upper respiratory infection and suspected sinusitis. Plaintiff complained of diffuse myalgia, fatigue, generalized weakness, and poor sleep when she was next seen by Dr. Spiller on May 24, 2006.

---

[2]/ Social Security Regulations impose an obligation upon claimants to follow the treatment prescribed by their physicians. 20 C.F.R. §§404.1530, 416.930.

The diagnosis was a history of fibromyalgia/connective tissue disorder, possible sinusitis, hypothyroidism, continued steroid use, hypertension, and reported diabetes. A sinus CAT scan done on May 26, 2006 was essentially negative. As noted, June 1, 2006 was identified as the last day that plaintiff worked and was the onset date set forth in her application for DIB.

On June 2, 2006, plaintiff was seen for the first time by Dr. Spady for complaints of leg and shoulder pain and leg swelling. The historical portion of the doctor's notes indicates that plaintiff had been diagnosed with arthritis of unknown origin three years earlier and was in a moderately severe state of discomfort with progressive worsening of joint symptoms to the elbows and knees and swelling in the left leg below the shin. The "review of symptoms" portion of Dr. Spady's note was positive for a variety of theretofore previously unmentioned symptoms including ear pain and tinnitis, chest pain, palpitations, abdominal pain, acid reflux symptoms, constipation, diarrhea, heartburn, hemorrhoids, nausea, vomiting, back pain, joint stiffness, limb pain, and memory loss. Yet in the section of the note containing the physical examination findings, Dr. Spady indicated that plaintiff had a normal heart rate and rhythm with no bruits or edema present; had an no Heberden's nodes, Bouchard's nodes, or synovitis; had a normal gait, grossly normal muscle tone and strength, and a full, painless

range of motion of all major muscle groups and joints with no laxity or subluxation of any joints; had no neurological deficits; and, had intact recent and remote memory. Plaintiff's occupation was identified as a pharmacy technician and she was fully capable of bathing and dressing herself, cleaning the house, cooking meals, driving a car, and generally living independently while caring for her four children. Notwithstanding the physical examination findings, the diagnosis was joint pain (multiple sites), leg and shoulder pain, and leg swelling. Plaintiff was prescribed Cymbalta and Darvocet-N and was to schedule a follow-up appointment in six weeks. No limitations whatsoever were imposed on plaintiff's activities.

Four days later, plaintiff returned to Dr. Raphael in minimal discomfort with sinus symptoms. The diagnosis was a migraine headache and sinus allergies. Imitrex and Nasocort were prescribed. On June 29, 2006, plaintiff complained of confusion, decreased memory, and crying spells and was diagnosed with possible narcolepsy. An MRI of the brain performed on July 10, 2006 revealed no acute intracranial process. The complaint voiced to Dr. Mussarat on July 13, 2006 was confusion and his diagnosis was migraines, possible narcolepsy, and depression. Zoloft was prescribed. Plaintiff also saw Dr. Spady on that date for increased confusion and an elevated sedimentation rate in addition to the

symptoms she had complained of in early June. Despite Dr. Mussarat's diagnosis earlier in the day, Dr. Spady reported no positive findings for depression. Plaintiff's activities of daily living and the results of the doctor's physical examination remained unchanged. In addition to what was diagnosed on June 2, 2006, the assessment also included fibromyalgia and an elevated sedimentation rate. Plaintiff was prescribed Plaquenil and injections of Prednisone and Ketorolac. Once again, no restrictions were placed on plaintiff's activities. An EEG preformed that date was normal as were the results of a brain MRA conducted on July 19, 2006.

In contrast to the activities of daily living recited by Dr. Spady on July 13, 2006, plaintiff reported on July 30, 2006 that she spent 95% of her time in bed and did no cooking, no household chores, and no yardwork. Plaintiff was seen for a third time by Dr. Spady on August 17, 2006 and advised that she had been treated at the hospital for dehydration and being impacted. Otherwise, the doctor's treatment note is the same as what was authored on July 13, 2006 including the recitation of her daily activities. Imuran and Lortab were prescribed. After reviewing plaintiff's file, Dr. Lee opined on August 24, 2006 that plaintiff was capable of light-level work. Over the next month, plaintiff consulted with Dr. Booth in connection with a lengthy bout of constipation. Plaintiff

then returned to Dr. Spady on October 18, 2006 with complaints of leg pain and swelling. Her memory problems were said to have improved and her activities of daily living remained the same. The assessment was lupus, leg pain and swelling, and fibromyalgia. Protonix was prescribed.

Throughout November of 2006, plaintiff continued to consult with Dr. Booth regarding her GI difficulties. She was also followed by Dr. Porter for possible pregnancy and an ovarian cyst. Plaintiff was seen for the fifth time by Dr. Spady on December 20, 2006 for complaints of leg pain and swelling. Plaintiff's activities of daily living remained unchanged as did the doctor's physical examination findings and diagnosis. On December 29, 2006, Dr. Spady completed the PCE form that is at the heart of plaintiff's first challenge to the Commissioner's decision. Notwithstanding the fairly routine daily activities that he had reported just nine days earlier, Dr. Spady indicated on the form that plaintiff could stand and walk less than one hour per eight hour workday, could sit less than two hours, could occasionally lift/carry less than ten pounds, could not use her hands for repetitive movements in operating foot controls, and could not reach above shoulder level. Dr. Spady further indicated that plaintiff could never perform postural maneuvers such as bending, kneeling, squatting, crouching, or climbing stairs or ladders. The

foregoing limitations were attributable to lupus and fibromyalgia with resulting pain and swelling in the wrist, elbows, and knees even though the report of plaintiff's most recent visit with the doctor stated that she had a "full, painless range of motion of all major muscle groups and joints [with] no laxity or subluxation of any joints." Extreme limitations in the ability to perform tasks within a regular work schedule were also allegedly present.

Plaintiff's lower abdominal and back pain had improved by the time that she was next seen by Dr. Porter on January 4, 2007. However, increased lower pelvic pain was present on February 9, 2007, possibly due to a motor vehicle accident. Abdominal and pelvic examinations were normal and the diagnosis was abdominal pain and constipation. An ultrasound ordered by Dr. Porter on March 13, 2007 revealed possible polyps and a second one was attempted on March 21, 2007 following an assessment of a ruptured ovarian cyst. Given that plaintiff's abdominal pain had stabilized by this time, Dr. Porter advised her to pursue her constipation issues with her primary care physician and specialist. Plaintiff thus presented to Dr. Reina on April 4, 2007 for treatment of continued constipation. Her medications were adjusted and additional testing was conducted over the next several days. On April 10, 2007, plaintiff was seen for the sixth time by Dr. Spady with the medical problems to be addressed being identified as pleuritic chest pain and body aches.

Plaintiff's activities of daily living remained unchanged. Physical examination findings on this date were contradictory for the presence of Heberden's and Bouchard's nodes but plaintiff was still said to have a full, painless range of motion of all major muscle groups and joints with no laxity or subluxation of any joints. Notwithstanding those findings, the assessment was joint pain at multiple sites, leg pain and swelling, fibromyalgia, and lupus. No restrictions were noted.

Over the following nine months, plaintiff would be evaluated by Dr. Spady on five additional occasions. Rheumatoid arthritis was added to the list of diagnosed conditions on August 29, 2007 and on October 10, 2007, lupus was removed from the list of diagnosed conditions. Only on January 14, 2008, her last documented visit with Dr. Spady, were plaintiff's activities of daily living modified to indicate that she could no longer clean the house, cook meals, drive a car, or ride public transportation although she was still said to be able to "live independently". Contrary to what was reported by Dr. Spady, plaintiff would subsequently testify at the administrative hearing held on February 25, 2008 that she was indeed able to drive a car and to perform light household chores after taking her prescribed medication.

In his written decision of March 10, 2008, the ALJ methodically discussed the records of all of the doctors who had

treated plaintiff, including Dr. Spady, and he relied on those
records in finding that plaintiff suffered from severe impairments
in the form of fibromyalgia and rheumatoid arthritis, with a prior
or alternative diagnostic impression of lupus, and obesity. (Tr.
pp. 16-18). Proceeding to step three of the five-step sequential
analysis, the ALJ then determined that plaintiff's conditions,
while severe, did not satisfy the criteria of any of those set
forth in the Listing of Impairments, particularly Listings 1.02 and
14.02. (Tr. p. 18). Having reached that conclusion, the Regulations
mandated that the ALJ make an assessment of plaintiff's RFC which
is defined as what the claimant can still do in spite of her
limitations. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e),
416.945. Just like the ultimate decision of whether or not a
claimant is disabled, the responsibility for determining an
individual's RFC lies with the ALJ as opposed to the doctors who
treated or evaluated the claimant. 20 C.F.R. §§404.1527(e)(1),
(f)(2), 404.1546, 416.927(e)(1), (f)(2), 416.946.

The information contained within the PCE form completed by Dr.
Spady was thus not entitled to controlling weight as it embraced an
ultimate issue that was reserved to the ALJ in the first instance.
Moreover, the form is unaccompanied by any contemporaneously-
recorded, medically acceptable findings, making the opinions
contained therein entitled to little weight. Warncke v. Harris,

619 F.2d 412, 417 (5th Cir. 1980).

In addition, the opinions contained within the PCE form are at odds with those set forth in Dr. Spady's own treatment records. On the form, the doctor reported that plaintiff could stand and walk less than one hour per eight-hour workday, could sit for less than two hours, could lift less than ten pounds on even an occasional basis, and could perform no postural maneuvers. Yet on December 20, 2006, a mere nine days before the PCE form was completed, and again on April 10, 2007, plaintiff's first visit with Dr. Spady following completion of the form, she was said to be capable of cleaning her house, cooking meals, driving a car, and generally living independently with her four children. On both occasions, plaintiff's occupation continued to be identified as a pharmacy technician and on both occasions physical examination findings indicated that plaintiff had a normal gait, grossly normal tone and muscle strength, and a full, painless range of motion of all major muscle groups and joints with no laxity or subluxation of any joints. It was for those reasons that the ALJ concluded that "[t]he functional limitations set forth by Dr. Spady are not accepted as they appear to be based primarily on subjective complaints with insufficient support when compared to Dr. Spady's own clinical findings." (Tr. p. 19). The ALJ accorded Dr. Spady's PCE findings the weight that they deserved.

In her second challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to properly evaluate her credibility, finding her allegations concerning her symptoms and related functional limitations to be only partially credible.

The Court recalls that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). In addition, the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced. Chapparo v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987) (citing Jones, 702 F.2d at 621 n.4). The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. Harrell, 862 F.2d at 480. The ALJ may discredit a plaintiff's subjective complaints of pain

and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)).

After discussing the findings of the various doctors who had treated plaintiff, the ALJ turned to the testimony plaintiff gave at the administrative hearing for the purpose of weighing her subjective complaints against the objective evidence of record. (Tr. pp. 16-18, 18-19). After doing so, the ALJ found plaintiff's allegations regarding the degree and duration of her symptoms and limitations to be only partially credible. Despite diagnoses of fibromyalgia, lupus, and, more recently, rheumatoid arthritis, objective findings recorded by Dr. Spady from 2006 and into 2007 consistently showed that plaintiff had a full, painless range of motion of all major muscle groups and joints, a normal gait, grossly normal muscle tone and strength, normal sensation and reflexes, and no indication of joint warmth or deformity. (Tr. pp. 212, 218, 225, 229, 235, 243, 251, 257, 265, 269). The ALJ also observed that while Dr. Spady noted some leg swelling by complaint and impression, the objective findings in his medical reports were not positive for swelling and Dr. Raphael found only trace pretibial edema on October 26, 2007. (Tr. p. 18). Plaintiff denied dizziness on the eleven occasions she was seen by Dr. Spady. (Tr.

39

pp. 199, 210, 214, 223, 227, 233, 241, 249, 255, 263, 267).

Plaintiff was not prescribed an excessive amount of pain medication

throughout her treatment history and the only documented medication

side-effect was from Metformin in March and April of 2006 which was

several months prior to the disability onset date identified in her

application for DIB. Plaintiff informed Dr. Spady on January 14,

2008 that she was no longer able to drive or perform household

chores but she testified to the contrary at the administrative

hearing that was held on February 25, 2008. Plaintiff's attorney

would also argue at the hearing that one of the symptoms of

plaintiff's conditions was weight loss but her weight was recorded

as 177.2 pounds on her first visit with Dr. Spady on June 2, 2006

and 180.8 pounds on her last visit with Dr. Spady on January 14,

2008. (Tr. pp. 269, 201). The ALJ did, in fact, articulate a number

of reasons for giving plaintiff's testimony the weight that he did.

That fulfills his duty here. Godbolt v. Apfel, 1999 WL 179476 at

*9 (E.D. La. 1999)(citing Falco v. Shalala, 27 F.3d 160, 164) (5th

Cir. 1994)). See also Augustine v. Barnhart, 2002 WL 927797 at *4

(E.D. La. 2002); Collins v. Callahan, 1998 WL 118082 at *3-4 (E.D.

La. 1998).


### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's

motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this _22nd_ day of _____October_____, 2009.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE